UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal Action No. 19-cr-40025-TSH |
| JUAN RODRIQUEZ | ) |
| | ) |
| | ) |
| Defendants | ) |

**FINDINGS AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED BY UNLAWFUL INTERCEPTION OF WIRE COMMUNICATION**
(Document No. 176)

**March 24, 2021**

**Introduction**

The Defendant Juan Rodriquez has moved to suppress from the introduction into evidence against him at trial, interceptions of wire communications from his cellular telephone number ("TT-3"). He assigns as reasons for the suppression that the affidavit in support of the warrant for the wiretap he did not have probable cause for the issuing magistrate judge to believe that the Defendant was committing a crime, that there was no probable cause that the proof of a crime would be found on the cellular telephone, and that normal investigative techniques had not be tried and found to be insufficient. For the reasons set forth below that motion is **denied.**

**Background**

Beginning in July of 2018 Worcester Police and the Bureau of Alcohol, Tobacco, and Firearms began investigating co-Defendant Junior Melendez and his associates for drug and gun violations. On March 13, 2019 the Government applied for, and received a warrant authorizing

the interception of electronic communication from co-Defendant Junior Melendez' cellphone ("TT-1").

On May 10, 2019, supported by the intercepted telephone calls on TT-1 the Government applied for, and received a renewal of that warrant and authorization for the interception of wire and electronic communications from cellphone number TT-3 belonging to the defendant Juan Rodriquez.  Agent Ventetuolo's 198-page affidavit in support of the application establishes more than sufficient probable cause for this court to conclude that Juan Rodriquez was engaged in drug trafficking and was using his cellphone in furtherance of the endeavor.  The affidavit recounts numerous instances of the Defendant using his cellphone to facilitate the sale of narcotics.

On a March 14, 2019 intercepted call, Rodriguez and Melendez had a conversation in which they discussed "almost the whole thing" and ended with Melendez telling Rodriquez that he would call him from a different phone.  In the agents training and experience this conversation involved with Rodriguez obtaining cocaine from Melendez and counseling Rodriguez to call him on a different phone to avoid detection.

On March 24, 2019 Rodriguez called Melendez stating that "the shit was still damp, and this batch was better than the last."  Again, in the agents experience and training this coded language concerned the conversion of powder cocaine into crack cocaine.  On that call Rodriguez again urged Melendez to "call him from the other one."  On April 3, 2019 Rodriguez called Melendez about making bail for their associate Lujan Burgos whose bail was set at $10,000.00 on a drug case.  Rodriguez told Melendez that he had $7,000.00 towards the $10,000.00 cash bail and needed help with the balance.  He descried Burgos as "one of my closest dudes."  Agent

Ventetuolo explained in the affidavit the importance of making bail in order to ensure Burgos remained silent and continued selling drugs.

The application for the warrant to intercept Rodriquez' wire communications is bolstered by the many references to drug dealing at Rodriguez' residence at 69 Cutler Street, in Worcester. The affidavit opines that this address was used as a location for Melendez and Rodriguez' drug operations. There is much in the affidavit to support this. Sixty-nine Cutler Street is listed as Rodriguez' residence on his criminal record and at the Massachusetts Registry of Motor Vehicle. April 22, 2019 surveillance at Cutler Street observed Melendez' Jaguar and a Nissan Rogue used by co-conspirator Anton Mack parked at the Cutler Street address. Later that afternoon Massachusetts State Police stopped Mack in that car on Route 495. Although they searched Mack and the Nissan Rogue no contraband was found. However, in monitoring that social media account later that day, Mack bragged that "stupid ass police if they only knew, LMAO" and "never fold under pressure." This suggests that Mr. Mack was carrying contraband when stopped. Significantly from 2:43 p.m. until 9:45 p.m. that same day TT-3 and Mack's phone exchanged 19 phone calls and 10 text messages.

On May 6, 2019, police observed what they believed to be a cocaine transaction taking place at Rodriguez's residence at 69 Cutler Street. Co-conspirator Angel Cordova arrived at the address in a gray Dodge Charger. Co-conspirator Kevin Jean exited the Cutler Street address and engaged in what the authorities believed to be a drug transaction in which Cordova supplied cocaine which Jean accepted on behalf of Melendez.

Agent Ventetuolo's affidavit also details Rodriguez' involvement in firearms offenses. On September 23, 2018, a Boston Police Officer was shot and two firearms recovered. The investigation revealed that New Hampshire resident Prazer Neenan had purchased one of those

firearms five weeks before the shooting.  Agents interviewed Mr. Neenan who admitted purchasing that firearm (and five others) for an individual named Jonathan Hoffler.  Mr. Hoffler was delivering them to a person called "Mula Monopoly."  Mula Monopoly is Rodriguez' nickname and Hoffler resides at the 69 Cutler Street address where Rodriguez also lives.  Rodriguez has a Facebook profile with a name "Mula Monopoly" and there are pictures of Mr. Hoffler and Rodriguez together on the Facebook page.

   On April 15, 2019, the Defendant Melendez told Shaun Walker (a co-Defendant of Melendez' in companion case 19-40024) that he would ask "Mula" about obtaining a firearm after Walker inquired about getting a gun from Melendez.  Less than a month later, Melendez and Rodriguez discussed their use of firearms in connection with an incident at the Rivera Nightclub in Worcester.  Rodriguez had called Melendez saying that he did not have "his shit" and Melendez indicated that he "would grab that thing from my sister," which affiant Ventetuolo took to mean his gun.

## Discussion

*The affidavit establishes probable cause*

In determining the sufficiency of the affidavit, the court must consider "whether the totality of circumstances stated in the affidavit demonstrates probable cause to search."  *United States v. Tiem Trinh*, 665 F.3d 110 (2011).  The court is charged with making a "practical commonsense determination as to whether given all circumstances set forth in the affidavit there is a probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v.Gates* 462 U.S. 213, 238 (1983).   The facts that set forth the affidavit are more than sufficient to establish probable cause to believe that Mr. Rodrigues was involved in drug and gun

offenses and that the fruits of the crime would be forthcoming from intercepted phone calls on that phone.

*The affidavit satisfies the necessity requirement*

Rodriguez argues that the application for the intercept failed to establish that "normal investigative procedures had been tried and failed." The so-called "necessity" requirement under section 2518 (3)(c) of Title 18 of U.S.C. is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose crimes." *United States v. Khan* 415 U.S. 143, 154 (1974). When a Defendant challenges a court's determination of necessity, the reviewing court's role is "not to make a de novo determination of sufficiency, *United States v. Santana*, 342 F.3d 65 (1st Cir. 2003), but instead to inquire as to 'whether the facts set forth in the application were minimally adequate to support the determination that was made.'" *United States v. Rose* 802 F.3d 114, 118 (1st Cir. 2015). The 198-page Ventetuolo affidavit very carefully defines the goals of the investigation. They include identifying and developing evidence necessary to prosecute Melendez and his associates, including Rodriguez, for narcotics and firearms violation, to identify the members and the structure of the drug trafficking and firearms organization, to identify the location of stash houses for guns and drugs, to recover illegal firearms, to identify and seize assets of the organization, and to dismantle the activities of Melendez, his associates, and the Vice Lords.

Under the necessity requirement the Government must show that it has "made a reasonable, good faith effort to run the gambit of normal investigative procedures before requesting a wiretap. "*United States v. Ovido-Villrman*, 325 F.3d 109, (2003. In other words, the affidavit must satisfy the court that it has "encountered difficulties with other evidentiary techniques that a

5

wiretap is a reasonable alternative under the circumstances." *United States v. Adou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986).

The affidavit set forth the techniques that were tried and failed, or which appeared reasonably unlikely to succeed, or were too dangerous. Those included cooperation from confidential sources. Melendez and Rodriguez bailed out criminal associates which obstructed agents' ability to develop confidential sources since people held on bail are more likely to cooperate with law enforcement. The affidavit also explains that undercover agents were not feasible because of the "nature of the Melendez drug trafficking organization." The undercover purchase of firearms or narcotics was unlikely to succeed because Melendez and his associates relied exclusively on people working for them and rarely participated in such deals personally.

One of the surveillance techniques that was used by the authorities was a pole camera and while admittedly having limited success, the pole cameras only provided information about a specific location and not the purpose of meetings or activities inside the premises that were being surveilled.

The affidavit established that the ATF and Worcester Police investigated Melendez and his associates for at least 8 months before they applied for a TT-1, and another 3 months before they applied for TT-3. During that time, they utilized or considered a wide variety of investigative techniques. Those traditional failed to establish the identity of co-conspirators and other sources a wiretap was needed.

## Conclusion

For the reasons set for above the Defendant's motion is **denied.**

/s/Timothy S. Hillman
Timothy S. Hillman
District Judg